STATE OF NORTH CAROLINA v. THOMAS LEE BONNEY

No. 38A89

(Filed 12 June 1991)

1. **Criminal Law § 525 (NCI4th) — murder — book in jury room — mistrial denied — no abuse of discretion**

The trial court did not abuse its discretion in a murder prosecution by denying defendant's motion for a mistrial where a book entitled "The Complete Jack the Ripper" was found in the jury room; the court examined the deputy who found the book and a juror out of the presence of the other members of the jury; the juror acknowledged that he had obtained the book earlier in the afternoon and had not begun to read it; the court instructed the juror that it might be better not to read that particular book while he was a juror in a murder trial; the juror stated that he had not considered that and that he had not discussed the book with the other jurors; and the court heard arguments and denied defendant's motion.

**Am Jur 2d, Trial § 1028.**

2. **Criminal Law § 531 (NCI4th) — murder trial — juror — television news — mistrial denied**

The trial court did not abuse its discretion in a murder prosecution by denying defendant's motion for a mistrial after an alternate juror reported that a juror had made a statement which indicated that he had been watching the news on television. The juror, when questioned in chambers, indicated that he lived in a trailer with thin walls and could hear the television even in the next room; he had not intentionally watched television news and had not discussed the present case with any members of the jury; he had left the room whenever he had heard the present trial mentioned; the trial court concluded that the juror had not been tainted by exposure to

news accounts, but granted defendant's motion to remove the juror out of an abundance of caution; and the court then denied defendant's motion for a mistrial.

**Am Jur 2d, Trial §§ 979-981, 1079, 1081.**

3. **Criminal Law § 543 (NCI4th) — murder — improper question by prosecutor — mistrial denied**

The trial court did not abuse its discretion in a murder prosecution by denying defendant's motion for a mistrial after the prosecutor asked a witness during cross-examination if he knew that defendant had a daughter with spina bifida whom defendant had deserted and there was then an outburst from defendant. The court ruled that the prosecutor's questions were improper and instructed the jury to disregard the questions, the witness's answers, and defendant's comments. It must be assumed that the jury followed the court's instructions.

**Am Jur 2d, Trial §§ 193, 919, 921.**

4. **Homicide § 15.2 (NCI3d) — murder — testimony that defendant did not love the victim — no prejudice**

There was no prejudice in a murder prosecution in allowing the victim's sixteen-year-old sister to testify that defendant, their father, did not love the victim. Assuming error, it is unlikely that the witness's one-word answer affected the result at trial in light of other extensive evidence tending to show that defendant had physically abused the victim in the past.

**Am Jur 2d, Homicide § 274.**

5. **Homicide § 21.5 (NCI3d) — murder — sufficiency of evidence**

The trial court did not err by denying defendant's motions to dismiss a first degree murder charge where the evidence tended to show that defendant was the last person seen with the victim while she was alive; defendant had physically abused her on prior occasions; defendant admitted to law enforcement officers that he had shot her and left her body lying along the road; defendant also stated that he had argued with the victim about letters he had found; he further acknowledged that he had his pistol hidden under his coat on the front seat at the time of the argument; he admitted that he continued to shoot the victim after the initial shot, although he main-

tained that she initially lunged for the weapon; defendant also admitted stripping the clothes from the victim's body before he left the scene; the autopsy report indicated that two gunshot wounds to the left forehead were fired only inches from the victim's head; the victim was shot a total of twenty-seven times; the wounds to the face and chest occurred before death, while wounds to the legs occurred after the victim died; and defendant made numerous false statements to authorities concerning the victim's disappearance.

**Am Jur 2d, Homicide §§ 425, 439.**

6. **Homicide § 7 (NCI3d); Criminal Law § 16 (NCI4th)— murder— insanity—M'Naghten Rule upheld**

The trial court did not err in a first degree murder prosecution by not allowing an expert witness to give evidence concerning defendant's insanity that would only be relevant if the M'Naghten Rule was abandoned.

**Am Jur 2d, Homicide §§ 114, 292, 406.**

7. **Homicide § 28.7 (NCI3d)— murder—insanity defense— requested instruction—given in substance**

The trial court did not err in a first degree murder prosecution by not giving defendant's requested instruction on the factors to be considered in determining whether defendant was legally insane. Assuming that defendant was entitled to the requested instruction, the instruction given essentially complied with that request.

**Am Jur 2d, Homicide § 515.**

8. **Criminal Law § 1344 (NCI4th)— murder—sentencing—especially heinous, atrocious or cruel aggravating factor—evidence sufficient**

The evidence in a first degree murder prosecution was sufficient to permit submission of the especially heinous, atrocious or cruel aggravating circumstance to the jury where the evidence taken in the light most favorable to the State tended to show an extremely brutal attack consisting of twenty-seven separate gunshot entrance wounds; two of the wounds to the left forehead had been inflicted from extremely close range; there were six gunshot wounds to the face, three to the neck, ten to the chest, and six to the legs; the wounds

STATE v. BONNEY

[329 N.C. 61 (1991)]

to the face and chest occurred before the victim died, while the wounds to her legs were inflicted after she was dead; the number of wounds tended to show that defendant had to stop and reload the weapon at least twice while he was inflicting the wounds during his murderous attack on his daughter; and, while the evidence tended to show that the victim died in two to three minutes, the evidence also tended to show that she was alive and aware of her fate while many of the shots were being fired into her. N.C.G.S. § 15A-2000(e)(9).

**Am Jur 2d, Criminal Law §§ 598, 599; Homicide §§ 552, 554, 555.**

9. **Criminal Law § 1352 (NCI4th) — murder — sentencing — McKoy error**

A first degree murder defendant was entitled to a new sentencing hearing where the court instructed the jury that it was not to consider a circumstance in mitigation unless it unanimously found that the circumstance existed. The error was not harmless because defendant presented substantial evidence to support at least one of the mitigating factors submitted but not found.

**Am Jur 2d, Criminal Law § 600.**

**Unanimity as to punishment in criminal case where jury can recommend lesser penalty. 1 ALR3d 1461.**

10. **Criminal Law § 1009 (NCI4th) — murder — motion for appropriate relief — misconduct of jury**

The trial court did not err by denying a murder defendant's post-trial motion for appropriate relief where a reporter stated that a juror had told him that a female juror had said that she had been contacted during deliberations by telephone by someone claiming to know defendant who said that defendant's lack of memory was feigned, that defendant was street smart, and that the evidence of insanity and multiple personality was false; the juror testified at a hearing that he recalled testimony at trial that defendant was street smart but did not recall a female juror stating that she had been contacted by someone outside the courtroom; and another juror testified to the same effect, adding that whether defendant was street smart was discussed in the jury room. The court found and concluded that there was insufficient evidence of any juror

misconduct and the court's findings are supported by substantial evidence.

**Am Jur 2d, Trial §§ 1023, 1075, 1087, 1099, 1224, 1233, 1234.**

APPEAL as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a death sentence entered by *Wright, J.*, at the 17 October 1988 Criminal Session of Superior Court, CAMDEN County. Heard in the Supreme Court on 14 March 1991.

*Lacy H. Thornburg, Attorney General, by Steven F. Bryant, Special Deputy Attorney General, for the State.*

*John W. Halstead, Jr. and John S. Morrison for the defendant-appellant.*

MITCHELL, Justice.

The defendant, Thomas Lee Bonney, was tried upon a proper bill of indictment charging him with the murder of his daughter, Kathy Bonney. The jury found the defendant guilty of first-degree murder on the theory of premeditation and deliberation. At the conclusion of a sentencing proceeding under N.C.G.S. § 15A-2000, the jury recommended and the trial court entered a sentence of death. On appeal, the defendant brings forward numerous assignments of error. We conclude that the defendant's trial and conviction were free from prejudical error. We further conclude, however, that prejudicial error during the sentencing proceeding in this case requires that the sentence of death be vacated and that this case be remanded to the Superior Court, Camden County, for a new capital sentencing proceeding.

The State's evidence at trial tended to show that around 7:00 p.m. on 21 November 1987, the defendant's daughter, Kathy Bonney, returned home from the grocery store with her mother, Dorothy Bonney, and her sister, Susan Bonney. When they entered the home, the defendant was talking on the telephone to a man named John. The defendant told Dorothy and Susan that he was going to take Kathy with him to look at a truck which was for sale.

After the defendant and Kathy left, Susan snuck out of the house and walked to a nearby 7-Eleven store where she observed them sitting in the car. The defendant and Kathy left together in the car soon thereafter. Approximately two hours later, the

defendant returned home and inquired as to Kathy's whereabouts, but no one in the family had seen her.

Later that night, Susan went outside and looked into the car where she observed blood on the seat. Susan told her mother about the blood and assumed that the defendant must have picked up a dead animal, but she never mentioned the blood to the defendant. Susan also returned to the 7-Eleven store that evening to look for Kathy. The defendant did not go out looking for Kathy that night.

On Sunday morning, 22 November 1987, the defendant went to the Chesapeake (Virginia) Police Department to report that his daughter, Kathy, was missing. The defendant said that on the previous evening he had gone to the 7-Eleven store with Kathy to meet a man who wanted to sell a Blazer. He added that Kathy knew the man and called him "John." The defendant said that the last time he saw his daughter was when she got into the Blazer with "John" at approximately 9:00 p.m. on 21 November 1987. The defendant stated that his daughter had stayed out all night once before. Officer Jeffrey Hardison noted that the defendant appeared nervous. Officer Hardison told the defendant that the police would wait twenty-four hours before filing a missing person report, due to Kathy's age.

On 22 November 1987, Wesley Lindquist drove his truck from Chesapeake, Virginia to the outskirts of Elizabeth City, North Carolina. After he turned around and headed back toward Virginia on Highway 17, Lindquist stopped near the Virginia-North Carolina state line along the Dismal Swamp Canal and stayed there a few hours. While walking along the canal, he looked down into a brush-filled and rocky embankment with very steep sides and saw the nude body of a female, later identified as that of Kathy Bonney. Lindquist then got in his truck and drove up the highway to call the police. It was around 3:00 p.m. when he called the police, and officers arrived in approximately fifteen minutes.

Sergeant Edward Lewis, a member of the Chesapeake Police Department dive-team, was called to the scene and arrived around 7:00 p.m. At the scene, he performed an evidence search. He described the body as appearing as though it had been dumped down the bank. He observed numerous wounds to the body including scratch marks. Also, there were small trees around the body and the limbs had bullet holes in them. Fibers from the small trees were observed in the victim's hair. There was also a bloody footprint or palm

print in the middle of the victim's chest. There were facial wounds to the victim's body, including a missing front tooth. A green sweater and a bloody undergarment or "teddy" with a ripped bottom were recovered from the water near the body. Also, there were marks on the wrists of the body similar to those left by handcuffs. No gun, shell casings or handcuffs were found in the area where the body was discovered. Officer Lewis opined that the body must have been dumped because no one could have carried it down the bank. No blood was found on the ground, although there was a moderate amount of blood on the victim's body.

At 6:42 p.m. on 22 November 1987, the defendant telephoned Vanessa Rogers, a dispatcher for the Chesapeake Police Department, and asked for Officer Hardison. The defendant said that he had discussed the filing of a missing person report with Hardison at an earlier time and that his daughter was still missing. Officer Anthony Perkins went to the defendant's home where he met with the defendant and took a missing person's report. The defendant stated that he had last seen Kathy at the 7-Eleven store where he took her to look at a truck. He said a man named John took Kathy for a test drive.

While at the defendant's residence, Officer Perkins received a call and, as a result, took Kathy's driver's license to the crime scene. At the crime scene, despite the aid of Kathy's driver's license, Detective Martin Williams was unable to make a positive identification of the victim. Later that evening, Detective Williams telephoned the defendant to ask if he could come to the defendant's home and get a photograph of Kathy. The defendant responded that it was too late, and the officer would have to wait until the next day.

On Monday, 23 November 1987, Detective Williams spoke with the defendant at his place of business. At that time, the defendant told the officer that Kathy had been dating John Hoskins, one of the defendant's former employees. The defendant had fired Hoskins about ten days earlier. The defendant then reported that he had been looking through Kathy's room and had found a letter in her diary. The letter was shocking to the defendant, and he described it as vulgar. In the letter, Kathy wrote of an affair with a married man and of a previous sexual relationship. The defendant appeared bothered when the officer kept the letter. The defendant repeated his version of what had happened at the 7-Eleven store on the

night Kathy disappeared. Later that evening, Detective Williams and other officers returned to the Bonney residence to dust Kathy's room for fingerprints.

Agent Malcolm McLeod of the SBI went with the defendant on 24 November 1987 looking for the Blazer. The defendant told McLeod that he and Kathy had driven a wrecker to the 7-Eleven store. The defendant also stated that he suspected his daughter had been having an affair with Hoskins. The defendant further stated that he had found a letter Kathy had written to John Hoskins and had given the letter to Detective Williams. During a search of Kathy's room on 24 November 1987, officers found some adult magazines and a pair of handcuffs in her closet.

On Wednesday, 25 November 1987, the body of the victim was identified as that of Kathy Bonney by matching the fingerprints of the body with those lifted from her room. When the defendant was told of this, he became extremely upset, began yelling and fell on the floor. As a result, paramedics were called to assist the defendant.

On Friday, 27 November 1987, Detective Robert Castelow of the Chesapeake Police Department spoke with the defendant. The defendant gave a description of the man named John for purposes of the preparation of a composite drawing. During the same evening, Detective Williams talked to the defendant about the incident with the Blazer. On this occasion, however, the defendant stated that he was driving his Chevrolet, not his wrecker, when he and Kathy went to the 7-Eleven store. The defendant also reported that his .22 caliber sawed-off rifle which had been stolen from his wrecker about the time John Hoskins had been fired.

On Monday, 30 November 1987, the defendant told Williams that he had sold his Chevrolet a few days earlier to a black man who worked at a junkyard. As a result, Williams began looking for the car.

Detective Williams next met with the defendant on Thursday, 3 December 1987, when the defendant came to the police station to view some photographs. Again, the defendant said he drove the Chevrolet to the 7-Eleven store and not the wrecker.

The defendant was interviewed again on Friday, 4 December 1987. The defendant was asked by Detective Williams if he owned a nine-shot .22 revolver. The defendant said he used to have one,

but he had sold it to a black man whose name he could not recall. The defendant then was asked if he had killed Kathy. The defendant denied the act and kept repeating that the officers were wrong. Also, he maintained that the photographs of the body at the crime scene were not photographs of his daughter.

On 10 December 1987, the defendant called Detective Williams and told him that he had found the Chevrolet at London Bridge Motors in Virginia Beach, Virginia. Later, the police arrived and seized the car.

On 1 February 1988, Detective Williams and SBI Agent Kevin McGinnis went to Indianapolis, Indiana, where the defendant had been arrested. Agent McGinnis interviewed the defendant after reading him his *Miranda* rights. During this conversation, the defendant said he had not been running. The defendant said he had left Chesapeake on 11 December 1987 and had been in several states. He said that on Friday, 20 November 1987, he had found copies of the letters Kathy had written to John Hoskins. On Saturday, 21 November 1987, he confronted her with this information while they were in the Chevrolet parked on the side of Highway 17. The defendant claimed that Kathy lunged for his gun, and it just went off. When asked if he had in fact shot Kathy, the defendant said he shot her while they were parked in the car. The defendant said that he had left her body along Highway 17 and then had driven home. The defendant further stated that "something snapped in his head" after he shot Kathy.

On 2 February 1988, Detective Williams and Agent McGinnis returned to the jail to take the defendant to North Carolina. While at the airport, the defendant repeated that he and Kathy had argued about the letters. The defendant stated that at the time he had his pistol under his coat on the front seat. He again claimed that Kathy had lunged for the pistol. Although he did not remember reloading or how many shots he fired, the defendant stated that he had continued to shoot Kathy. He thought she had screamed when she was first shot. The defendant said that he did not shoot Kathy and then drive to the scene, but that everything had taken place there. He also admitted that he had removed Kathy's clothes. He had carried the gun and extra bullets with him that night. The defendant stated that he had thrown his gun over a bridge and into the river at Battlefield Boulevard. He put the spent shell casings in the gas tank of the wrecker.

STATE v. BONNEY

[329 N.C. 61 (1991)]

Dr. Lawrence S. Harris testified as an expert in forensic pathology. On 23 November 1987, he performed the autopsy on the body of Kathy Bonney. An external examination revealed multiple gunshot wounds. There were numerous scratches on the body which probably had been made by briers and brush. In Dr. Harris's opinion, some of the scratches were made before the victim's death, and others were made after death.

Dr. Harris noted that two of the gunshot wounds to the body were close together and had been inflicted from close range. Those two wounds were over the left forehead. The wounds were nearly parallel, and the bullets entered the brain cavity. The weapon was only inches from the head when these two shots were fired.

Six gunshot wounds to the victim's face resulted from shots fired from some distance and left no gunpowder residue or burning. One of these wounds broke teeth in the upper jaw. There were also three gunshot wounds to the neck. The bullets making those wounds traveled upward and into the brain. There was a group of ten gunshot entrance wounds to the chest. Seven of those were near the left breast, and four of them went through the heart. A group of six separate gunshot wounds went through the lower legs. Dr. Harris identified a total of twenty-seven separate gunshot entrance wounds to the victim's body. In his opinion, four or five of the gunshot wounds were made after death.

Dr. Harris estimated that the victim had lost two to three quarts of blood. From an examination of the photographs of the victim's body at the crime scene, Dr. Harris opined that the wounds to the chest occurred before the death. The cause of death was the multiple gunshot wounds to the chest and face. In Dr. Harris's opinion, the victim would have died in two to three minutes after the wounds had been inflicted. In his opinion, the two wounds to the head, eight wounds to the face, and ten wounds to the chest all occurred before death. The wounds to the legs occurred after death. Also, he opined the wounds to the face and head would have rendered Kathy unconscious almost immediately, and she would have felt no pain.

SBI Agent Lucy Milks testified as an expert in forensic serology. She examined the standard rape kit used in examining the body and found no evidence of sexual activity by the victim. Also, she examined the defendant's car and performed a field test which indicated that there was blood on the front passenger's seat. From

a cutting of the seat, she later determined that it was human blood and was consistent with Kathy Bonney's blood type. Also, blood found on the door handle of the passenger's door of the car and on the teddy was consistent with Kathy's blood type. SBI Agent John Bendure, found by the Court to be an expert in forensic fiber examination, testified that the teddy could have been the one worn by Kathy.

Agent Troy Hamlin, a forensic chemist with the SBI, also testified as an expert. He examined known head hair of the victim and found it to be consistent with hair removed from the rear and the trunk of the defendant's Chevrolet.

George Bess, an employee of Tabbs Auto Parts, testified that sometime near the end of 1987 or the beginning of 1988, he discovered .22 caliber shell casings in the gas tank of the wrecker that had belonged to the defendant at the time Kathy was killed. Detective James Eanes of the Chesapeake Police Department removed twenty-five spent shell casings and one live round from the wrecker at the direction of Mr. Bess.

SBI Agent Eugene Bishop testified as an expert in firearms examination. He testified that at least seven of the bullet fragments taken from the victim's body had been fired from one weapon. Also, he examined the twenty-five spent shell casings and one live round taken from the gas tank of the wrecker and concluded that all of the spent shell casings had been fired by the same gun that left the bullet fragments in the victim's body. In his opinion, the spent shell casings had been fired from a revolver rather than an automatic because there were no ejector marks on them. Thus, the casings had to have been removed from a revolver either by hand or by pushing a cylinder pin.

The defendant did not testify at trial but offered evidence in his own behalf. Dr. Paul Dell, found by the trial court to be an expert in clinical psychology, testified that he had conducted a series of interviews with the defendant beginning in July of 1988. He also had given the defendant a series of personality tests. Based on his examination of the defendant, Dr. Dell formed the opinion that the defendant suffered from multiple personality disorder, post-traumatic stress disorder and mixed personality disorder. His primary diagnosis was multiple personality disorder.

Dr. Dell testified that he had identified ten separate personalities of the defendant. Dr. Dell said that multiple personality disorder occurs in childhood and results from a severe childhood trauma. In the defendant's case, the trauma was the death of his maternal grandmother when the defendant was age ten. Dr. Dell identified the defendant's ten separate personalities by name as ". . . Tom, the host personality; Satan; Mamie; Demian; Viking; Tommy; Hitman; Preacher; Dad; and Kathy." Dr. Dell was able to identify these personalities by the use of hypnosis. He said that each separate personality had a function which enabled the defendant to cope with a trauma he had experienced. His interviews with the defendant were recorded on videotape. The tapes were admitted into evidence to illustrate Dr. Dell's testimony. According to Dr. Dell, the personality, Demian, was in control when the defendant shot Kathy, and Demian believed he was shooting the defendant's father who had abused him in childhood.

Dr. Dell testified that the defendant was suffering from multiple personality disorder and post-traumatic stress disorder on 21 November 1987. He believed that at the time Kathy was killed, the defendant was incapable of knowing the nature and quality of his actions. Further, the defendant could not distinguish right from wrong at the time Kathy was shot.

John McClung, the defendant's former business partner, testified that he had known the defendant for about fourteen years. He was also friends with Kathy. McClung described the defendant's history of poor memory. He also described the defendant's abrupt mood swings concerning the Bible and religion. He also mentioned the defendant's love-hate relationship with his father. McClung had never seen the defendant physically abuse any of his children. In his opinion, the defendant loved Kathy. McClung also testified that near the time of the offense, the defendant had not been acting normal or like one in his "right mind." On cross-examination, Mr. McClung acknowledged that Kathy had told him the defendant had hit her on prior occasions. Also, McClung admitted that he had stated previously that the defendant was "street wise" and that the defendant knew the difference between right and wrong.

In rebuttal, the prosecution presented Dr. Phillip Coons, who was found by the trial court to be an expert in clinical psychiatry, multiple personality disorder and hypnosis. Dr. Coons had reviewed approximately thirteen hours of the videotapes of the interviews

between the defendant and Dr. Dell, as well as the tests given by Dr. Dell. Although Dr. Coons did not interview the defendant and made no diagnosis of the defendant, he was critical of the methods used by Dr. Dell in reaching his conclusions. For example, he noted that Dr. Dell did not conduct a proper psychiatric interview before using hypnosis. He noted that Dr. Dell allowed the defendant to ramble and also asked the defendant leading questions. Also, in Dr. Coons's opinion, the death of a loved one was not a sufficient trauma to result in a multiple personality disorder. Additionally, Dr. Dell improperly suggested to the defendant that he might have other personalities, while the defendant was under hypnosis. Dr. Coons also stated that the symptoms of multiple personality disorder could be created by such hypnosis.

Dr. Bob Rollins, found by the court to be an expert in forensic psychiatry, was the attending physician while the defendant was at Dorothea Dix Hospital from 28 September 1988 to 14 October 1988. Based on his evaluation, Dr. Rollins testified that the defendant did have serious mental problems and provisionally diagnosed the defendant as having a multiple personality disorder. Although he found that at the time of the offense the defendant suffered from a disease of the mind and from defective reasoning, Dr. Rollins concluded that the defendant did know the nature and quality of his act and the difference between right and wrong.

Other pertinent facts are hereinafter set forth.

By his first assignment of error, the defendant contends the trial court erred by denying his motions for mistrial. During the trial proceedings, the defendant moved for a mistrial on three different occasions. We conclude that the trial court properly denied each of the defendant's motions for mistrial.

[1] The decision to grant or deny a mistrial rests within the sound discretion of the trial court. State v. Warren, 327 N.C. 364, 376, 395 S.E.2d 116, 123 (1990). "A mistrial should be granted only when there are improprieties in the trial so serious that they substantially and irreparably prejudice the defendant's case and make it impossible for the defendant to receive a fair and impartial verdict." Id.; N.C.G.S. § 15A-1061 (1988). Consequently, a trial court's decision concerning a motion for mistrial will not be disturbed on appeal unless there is a clear showing that the trial court abused its discretion. Id.

STATE v. BONNEY

[329 N.C. 61 (1991)]

The defendant's first motion for a mistrial related to a book found in the jury room during the defendant's trial. The trial court informed counsel out of the presence of the jury that a book entitled "The Complete Jack the Ripper" had been found in the jury room. Thereafter, the defendant's counsel informed the trial court that a motion for mistrial would be made.

Later the same day, in open court but out of the presence of the other members of the jury, Juror George Johnson and Deputy Sheriff Virgil Williams were examined. With all parties and counsel present, the trial court examined Deputy Williams who explained that he had found the book in the jury room after lunch. Deputy Williams stated that he told Juror Johnson to keep the book on the table, to take it home at the end of the day and that he might choose a better book to read. Deputy Williams did not think any of the other jurors heard this conversation. Juror Johnson was also sworn and examined. He acknowledged that he had obtained the book from the library earlier in the afternoon, but stated that he had not started to read it yet. The trial court instructed Johnson that although he could read anything he wanted, it might be better not to read the particular book in question while he was a juror in a murder trial. Johnson stated that he had not even considered that fact. He also stated that he had not discussed anything in the book with the other jurors. After Johnson was excused, the trial court heard arguments and denied the defendant's motion. The trial court conducted a thorough inquiry into the circumstances in question and determined from the evidence before it that no juror had been improperly influenced. The defendant has failed to show that the trial court abused its discretion by denying his first motion for a mistrial.

[2] In another incident, the trial court and the parties were in chambers when they were informed by an alternate juror that Juror Johnson had made a statement to the other members of the jury which indicated that he had been watching the news on television. On the next day of court, the parties again met in chambers. The defendant's counsel requested that the trial court conduct a *voir dire*, moved for a mistrial, and also moved to remove Juror Johnson.

In chambers, the trial court questioned Johnson concerning whether he had watched the news. Johnson was then questioned by the defendant's counsel. Johnson explained that he lived in

a trailer and, because the walls were thin, he could hear the television even when he was in the bedroom. Johnson testified that he had not intentionally watched the television news and that he had not discussed the present case with any members of the jury. Johnson further stated that whenever he had heard the present trial mentioned he left the room. The trial court made findings and concluded that Juror Johnson had not been tainted by exposure to any news accounts. However, the trial court noted that it was granting the defendant's motion to remove Juror Johnson out of "an abundance of precaution." The trial court then denied the defendant's motion for mistrial. Since Juror Johnson was excused upon motion of the defendant, the defendant has failed to show that Johnson's exposure to news accounts deprived him of a fair trial or that the trial court abused its discretion by denying his motion for a mistrial.

[3] The third incident which led to a motion for a mistrial took place during the cross-examination of Dr. Dell as follows:

[PROSECUTOR]—Dr. Dell, did you know that when he (the defendant) was in Texas he had another daughter?

[DR. DELL]—No.

[PROSECUTOR]—Did you know that he had a daughter named Debbie who had Spina Bifida?

[DR. DELL]—No.

[PROSECUTOR]—Did you know that he deserted her in a motel room?

[DR. DELL]—No. I did not know that.

MR. BONNEY: That's a lie. That's a lie.

THE COURT: Okay. Take the jury out a minute, please.

The trial court then directed the defendant's counsel to take the defendant from the courtroom for a conference. After a recess, the defendant's counsel moved for a mistrial on the ground that the questions asked of Dr. Dell by the prosecutor assumed facts not in evidence. The prosecutor explained that he had a good faith basis for the questions based upon a report from a social services agency. The defendant then made a motion for a mistrial on the ground of the defendant's "outburst." After hearing arguments, the trial court ruled that the prosecutor's questions were improper

but denied the defendant's motions for a mistrial. After the jury returned, the trial court instructed that the questions by the prosecutor, Dr. Dell's answers and the comments by the defendant were to be disregarded. We must assume that the jury followed the trial court's instructions in this regard. Therefore, we conclude that the trial court did not abuse its discretion by denying the defendant's motions for mistrial in this situation.

For the foregoing reasons, we conclude that the trial court did not abuse its discretion by denying the defendant's motions for mistrial. Accordingly, this assignment of error is without merit.

[4] By his next assignment of error, the defendant contends that the trial court erred by allowing the defendant's sixteen-year-old daughter, Susan Bonney, to testify that the defendant did not love her sister, Kathy Bonney. During the direct examination of Susan Bonney, the prosecutor asked her whether, in her opinion, her father loved Kathy. Over objection, Susan testified, "No."

The defendant argues that there was no evidence having any tendency to show that Susan had any personal knowledge as to whether the defendant loved Kathy and that the trial court erred in admitting Susan's answer. Assuming, *arguendo*, that the trial court erred in this regard, we conclude that the defendant has failed to bear his burden under N.C.G.S. § 15A-1443(a) of showing prejudice. It is unlikely that Susan's one-word answer affected the result at trial, in light of the other extensive evidence tending to show that the defendant had often physically abused Kathy in the past. This assignment of error is overruled.

[5] The defendant next assigns as error the trial court's denial of his motions to dismiss the first-degree murder charge against him. The defendant made motions to dismiss at the close of the State's evidence and at the close of all of the evidence. When a defendant presents evidence, he waives his right to appeal the denial of his motion to dismiss at the close of the State's evidence. N.C.G.S. § 15-173 (1983); *see State v. Smith*, 320 N.C. 404, 358 S.E.2d 329 (1987). Therefore, only the motion to dismiss at the close of all the evidence is before this Court. *State v. Bullard*, 312 N.C. 129, 160, 322 S.E.2d 370, 387 (1984).

In ruling on a motion to dismiss, the trial court must determine whether there is substantial evidence of each element of the offense

STATE v. BONNEY

[329 N.C. 61 (1991)]

charged, and that the defendant is the perpetrator. *State v. Earnhardt*, 307 N.C. 62, 296 S.E.2d 649 (1982).

> Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). The term "substantial evidence" simply means "that the evidence must be existing and real, not just seeming or imaginary." *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980).

*State v. Vause*, 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991). Further, the trial court must consider the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference. *Id.* at 237, 400 S.E.2d at 61. If there is substantial evidence of each element of the offense charged or lesser included offenses, the trial court must deny a defendant's motion to dismiss as to those charges supported by substantial evidence and submit them to the jury for its consideration; the weight and credibility of such evidence is a question reserved for the jury. *Id.* at 236-37, 400 S.E.2d at 61.

Murder in the first degree is the unlawful killing of another human being with malice and with premeditation and deliberation. N.C.G.S. § 14-17; *see Vause*, 328 N.C. at 238, 400 S.E.2d at 62. Premeditation and deliberation generally must be established by circumstantial evidence, because they ordinarily are not susceptible to proof by direct evidence. *Id.* "Premeditation" means that the defendant formed the specific intent to kill the victim some period of time, however short, before the actual killing. *Id.* "Deliberation" means an intent to kill executed by the defendant in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation. *State v. Judge*, 308 N.C. 658, 661, 303 S.E.2d 817, 820 (1983). In the context of determining the existence of deliberation, however, the term "cool state of blood" does not mean an absence of passion and emotion. *Vause*, 328 N.C. at 238, 400 S.E.2d at 62. One may deliberate, may premeditate, and may intend to kill after premeditation and deliberation, although prompted and, to a large extent, controlled by passion at the time. *Id.*

The evidence in the present case tended to show that the defendant was the last person seen with Kathy while she was alive. On prior occasions, he had physically abused her. The defend-

ant admitted to law enforcement officers that he had shot Kathy and left her body along the road. The defendant also stated that he argued with Kathy about the letters he had found. He further acknowledged that at the time of the argument he had his pistol hidden under his coat on the front seat. Although he maintained that Kathy initially lunged for the weapon, the defendant admitted that he continued to shoot her after the initial shot. In addition, he admitted stripping the clothes from her body before he left the scene. The autopsy report indicated that two gunshot wounds to the left forehead were fired only inches from Kathy's head. Kathy was shot a total of twenty-seven times. The wounds to the face and chest occurred before death, while the wounds to the legs occurred after the victim had died. Prior to the discovery of Kathy's body, the defendant made numerous false statements to authorities concerning her disappearance. Taken in the light most favorable to the State, there was substantial evidence that the defendant killed Kathy with malice, premeditation and deliberation. The trial court did not err in denying the defendant's motion to dismiss at the conclusion of all of the evidence. This assignment of error is without merit.

[6]   In his next assignment of error, the defendant contends the trial court erred by not allowing an expert witness to give opinion testimony concerning the defendant's "insanity." The defendant contends that the expert testimony in question would be relevant if the definition of insanity under North Carolina law were changed; however, he concedes that the testimony is irrelevant under current North Carolina law. In effect, the defendant is asking this Court to abandon the M'Naghten Rule, which we have adhered to for many years, in favor of another definition of insanity. Under that test of insanity as a defense to a criminal charge, a defendant is insane if, at the time of the crime, he was laboring under such a defect of reason from disease or deficiency of mind as to be incapable of knowing the nature and quality of his act or, if he did know this, of distinguishing between right and wrong in relation to such act. *State v. Evangelista,* 319 N.C. 152, 161, 353 S.E.2d 375, 382 (1987). On numerous occasions in the past, this Court has declined to adopt a different definition of "insanity." *E.g.,* *State v. Mancuso,* 321 N.C. 464, 470, 364 S.E.2d 359, 363 (1988). We find no reason to depart from past decisions of this Court regarding this issue; hence, we decline to abandon the M'Naghten Rule.

STATE v. BONNEY

[329 N.C. 61 (1991)]

[7] By another assignment of error the defendant contends the trial court erred by failing to give his requested instruction concerning the factors to be considered in determining whether the defendant was legally insane. We disagree.

The requested instruction listed lack of provocation, threats and conduct by the defendant, excessive force, infliction of wounds after the victim was rendered helpless, the brutality of the act and the manner in which the murder was accomplished. The defendant argues that the trial court should have complied with his request by instructing the jury that it could consider those factors in order to "infer" insanity. Instead, the trial court instructed the jury that it was required to consider all of the evidence which had "any tendency to throw light on the mental condition of Thomas Bonney," and that it could consider all of the evidence admitted at trial relating to his mental condition. Assuming, *arguendo*, that the defendant was entitled to the instruction he requested, the instruction given by the trial court essentially complied with his request. The defendant was not entitled to an instruction using the exact words he requested. The substance of the defendant's request having been granted by the trial court in its instruction, there was no error. This assignment of error is without merit.

[8] By his next assignment of error, the defendant contends the evidence was insufficient to permit submission of the aggravating circumstance that the murder was "especially heinous, atrocious or cruel" to the jury for its consideration. N.C.G.S. § 15A-2000(e)(9) (1988). We disagree.

Although every murder may be characterized as heinous, atrocious, or cruel, our legislature has made it clear that this aggravating circumstance may be found only in cases in which the first-degree murder committed was *either* especially heinous, especially atrocious, *or* especially cruel. N.C.G.S. § 15A-2000(e)(9) (1988). For example, a finding that this statutory aggravating circumstance exists is permissible only when the level of brutality involved exceeds that normally found in first-degree murder or when the first-degree murder in question was conscienceless, pitiless or unnecessarily torturous to the victim. *State v. Hamlet*, 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984). Further, this aggravating circumstance also may be found when the killing demonstrates an unusual depravity of mind on the part of the defendant, beyond

that normally present in first-degree murder. *State v. Stanley*, 310 N.C. 332, 345, 312 S.E.2d 393, 401 (1984).

In *State v. Oliver*, 309 N.C. 326, 307 S.E.2d 304 (1983), we identified two of the types of first-degree murders which would warrant the submission of the especially heinous, atrocious, or cruel aggravating circumstance to the jury. One type consists of killings which are physically agonizing for the victim or which are in some other way dehumanizing. Another consists of those killings which are less violent but involve the infliction of psychological torture — including placing the victim in agony, aware of but helpless to prevent impending death.

In determining whether the evidence is sufficient to support a finding of essential facts which in turn would support a determination that a murder was "especially heinous, atrocious, or cruel," the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Moose*, 310 N.C. 482, 313 S.E.2d 507 (1984). The evidence in the instant case supported a finding that the level of brutality exceeded that normally found in first-degree murder cases and that it was pitiless and unnecessarily torturous to the victim. The evidence taken in the light most favorable to the State tended to show an extremely brutal attack consisting of twenty-seven separate gunshot entrance wounds. Two gunshot wounds to the left forehead had been inflicted from extremely close range. There were six gunshot wounds to the face, three gunshot wounds to the neck, ten gunshot wounds to the chest and six gunshot wounds to the legs. The wounds to the face and chest occurred before the victim died; whereas, the wounds to her legs were inflicted after she was already dead.

Furthermore, the evidence tended to show that the murder was exceptionally pitiless and involved the infliction of psychological torture. The number of wounds tended to show that the defendant had to stop and reload the weapon at least twice while he was inflicting the wounds during the course of his murderous attack on his daughter.

Evidence tended to show that Kathy probably died in two to three minutes after the wounds were inflicted and that the wounds to her head and face probably would have caused her to lose consciousness. However, taken in the light most favorable to the State, this evidence tended to show Kathy was alive and

aware of her fate while many of the shots were being fired into her. Hence, evidence tended to show during her last moments Kathy was aware of, but helpless to prevent, her impending death. In the present case, the evidence was sufficient to support the jury's finding of the aggravating circumstance that the first-degree murder was "especially heinous, atrocious, or cruel" beyond a reasonable doubt. N.C.G.S. § 15A-2000(c)(1) (1988) (for imposition of death sentence, aggravating circumstances must be found beyond a reasonable doubt). Therefore, this assignment of error is overruled.

[9] By his next assignment of error, the defendant contends the trial court erred in instructing the jury that in determining whether to recommend life imprisonment or death it was not to consider a circumstance in mitigation unless it unanimously found that it existed. As a result of this error, the State concedes that the defendant is entitled to a new sentencing proceeding. We agree.

Because the trial court required that the jury unanimously find any mitigating circumstance before that circumstance could be considered in the ultimate sentencing, the defendant's sentence runs afoul of *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). The *McKoy* error here is not harmless because the defendant presented substantial evidence to support at least one of the mitigating circumstances submitted to but not found by the jury. For example, the jury failed to find unanimously as a mitigating circumstance that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. N.C.G.S. § 15A-2000(f)(6) (1988). There was evidence tending to support this circumstance. Dr. Robert L. Rollins, found by the trial court to be an expert in forensic psychiatry, testified *inter alia* that in his opinion the defendant's mental disorder impaired his ability to appreciate the criminality of his conduct and his ability to conform his behavior to the requirements of the law. One or more of the jurors may have believed this circumstance existed. Yet, the erroneous instructions prohibited these jurors from considering this circumstance because it was not unanimously found when the jury made its ultimate sentencing decision. Had each juror been allowed to consider the circumstances that he or she believed to exist—but other jurors did not find—while engaging in the final weighing process, we cannot say beyond a reasonable doubt that there would not have been a different result as to sentence. N.C.G.S. § 15A-1443; *see State v. McKoy*, 327 N.C. 31, 45, 394 S.E.2d 426, 434 (1990).

Therefore, we are required to vacate the sentence of death and remand this case to the Superior Court, Camden County, for a new capital sentencing proceeding. Our disposition on the *McKoy* issue makes it unnecessary for us to consider the other assignments of error concerning the defendant's capital sentencing proceeding.

By his next assignment of error, the defendant contends the trial court erred by denying his post-trial motions. However, we deem this assignment of error abandoned and decline to address it because the defendant has cited no reasonable authority in its support. N.C.R. App. P. 28(b)(5) (1991).

[10] By his final assignment of error, the defendant contends the trial court erred by denying his post-trial motion for appropriate relief. We disagree.

The defendant was sentenced on 30 November 1988. On 1 December 1988, he filed a motion for appropriate relief alleging jury misconduct. The motion arose due to information allegedly obtained by James Pate during post-verdict interviews with the jurors. Pate was a reporter for The Virginian-Pilot who had covered the trial. Pate *voluntarily* testified before the trial court concerning his "*off the record*" interview of Glenn Ward after the defendant's trial. Pate said Juror Ward had told him that during the jury's consideration of the defendant's case, a female juror had advised the other jurors that she had been contacted by telephone by an individual claiming to know the defendant. She had told the jurors that the individual said that the defendant's alleged lack of memory was feigned, that the defendant was "street smart" and that evidence of insanity and multiple personality was false. The trial court deferred any ruling on the defendant's motion until a later time.

On 17 January 1989, the trial court conducted a hearing on the defendant's motion. Juror Ward testified at the hearing and stated that he recalled testimony at trial that the defendant was "street smart." He testified that he did *not* recall a female juror stating that she had been contacted by someone outside the courtroom.

Juror George Huskey was called as a witness by the defendant. On direct examination by the defendant, Huskey was asked whether, during the jury's deliberations, any statements were made by any member of the jury that they had been contacted by someone

STATE v. BONNEY

[329 N.C. 61 (1991)]

outside the courtroom claiming to know the defendant. Huskey replied that at some point during the trial someone described the defendant as being "street smart," but he thought that he had heard that statement in the courtroom. He then stated that whether the defendant was "street smart" was discussed in the jury room. He further testified that whoever brought the matter up in conversation did *not* say that they had been contacted outside the courtroom. On cross-examination, Mr. Huskey acknowledged that he recalled the defendant's business partner, John McClung, answering "yes" after being asked during his sworn testimony in open court whether the defendant was "street wise."

Based on the evidence, the trial court found and concluded that there was insufficient evidence of any jury misconduct to support the defendant's motion for appropriate relief. Therefore, the trial court denied the motion.

The determination of the existence and effect of jury misconduct is primarily for the trial court whose decision will be given great weight on appeal. *State v. Gilbert*, 47 N.C. App. 316, 319, 267 S.E.2d 378, 379 (1980). It has long been the rule that:

> In North Carolina, in instances when the contention was made by the defendant that the jury has been improperly influenced, it has been held that it must be shown that the jury was actually prejudiced against the defendant, to avail the defendant relief from the verdict, and the findings of the trial judge upon the evidence and facts are conclusive and not reviewable.

*State v. Hart*, 226 N.C. 200, 203, 37 S.E.2d 487, 489 (1946). In this case, the trial court examined the jurors about the alleged incident causing concern and found as a fact that there was no evidence which would support the allegation of jury misconduct. The trial court's findings are supported by substantial evidence and, in turn, support its conclusions and its order denying the defendant's motion. This assignment of error is without merit.

For the foregoing reasons, we conclude that the guilt phase of the defendant's trial was free from prejudicial error. However, the error in the capital sentencing proceeding requires that the death sentence be vacated and this case remanded to the Superior Court, Camden County, for a new capital sentencing proceeding.

Guilt phase: no error.

**IN RE ALAMANCE COUNTY COURT FACILITIES**

[329 N.C. 84 (1991)]

Death sentence vacated and case remanded for new capital sentencing proceeding.