STATE OF NORTH CAROLINA
v.
MARKESE DONNELL RICE, Defendant.
No. COA09-1099.
Court of Appeals of North Carolina.
Filed April 20, 2010.
Attorney General Roy Cooper, by Assistant Attorney General Charles E. Reece, for the State.
Geoffrey W. Hosford for defendant-appellant.

UNPUBLISHED OPINION
ROBERT C. HUNTER, Judge.
Defendant Markese Donnell Rice appeals his first degree murder conviction, primarily arguing that the trial court erred in admitting a statement by the victim, Richard Deas, that defendant had threatened to kill him. We conclude, however, that Mr. Deas' statement was properly admitted as an "excited utterance" and uphold defendant's conviction.

Facts
The State's evidence tended to establish the following facts at trial: For roughly 10 years, defendant was in a romantic relationship with Twanda Perry and the couple had four children during the time they were together. Although they had broken up several times during their 10 years together, their relationship ended "for good" sometime in June 2007. Defendant asked Ms. Perry to get back together with him during the summer and fall of 2007, but she refused.
Ms. Perry met Mr. Deas in July 2007 at Carolinas Medical Center in Charlotte, where they both worked. Ms. Perry and Mr. Deas began seeing each other and by October 2007 Ms. Perry considered Mr. Deas to be her boyfriend. Defendant became "agitated" when defendant learned about Ms. Perry's relationship with Mr. Deas. As a result, Ms. Perry did not tell defendant about the extent of her relationship with Mr. Deas.
On 18 October 2007, Ms. Perry planned to pick up Mr. Deas from the hospital in the afternoon and drive him to his second job. Before picking up Mr. Deas, Ms. Perry talked with defendant and agreed to meet him at a gas station so that he could pay for her to get some gas in order for her to pick up their children later that day. At the gas station, Ms. Perry became "frustrated" with defendant because she believed that he had offered to buy her gas as a "ploy to see [her] or talk to [her]." Ms. Perry left the gas station without getting any gas and drove around to avoid defendant following her before driving to the hospital to pick up Mr. Deas.
As Ms. Perry pulled up to the hospital and Mr. Deas approached her car, Ms. Perry received a call on her cell phone from defendant, in which he said: "I got you, I got you." Ms. Perry then saw defendant's car pull up and park directly behind her's. Defendant, his brother, Lamar Rice, and his nephew, Frankie Jackson, got out of defendant's car and confronted Ms. Perry and Mr. Deas. Defendant, Lamar Rice, and Mr. Jackson tried to prevent Mr. Deas from getting into Ms. Perry's car. Lamar Rice tried to intimidate Ms. Perry and Mr. Deas and was the "most aggressive" during the confrontation, while defendant and Mr. Jackson acted "cool." During the encounter, defendant said "sarcastic[ally]" to Mr. Deas that he "wanted to meet his kids' future stepfather" and tried to shake Mr. Deas' hand. Ms. Perry felt intimidated by defendant's actions and both she and Mr. Deas were scared. Ms. Perry knew that defendant had a 9mm handgun and kept it with him "all the time."
Mr. Deas asked Ms. Perry to pick him up at the front entrance to the hospital and went back inside. While he was running down the escalator in the hospital lobby, Mr. Deas saw a friend of his, Edna Diggs-Harrison, who was the hospital's security dispatcher. Mr. Deas was sweating and looked upset, so Ms. Diggs-Harrison asked him if something was wrong. Mr. Deas told Ms. Diggs-Harrison that defendant had just threatened to kill him and that he needed to find a security officer. After saying goodbye, Ms. Diggs-Harrison walked back to her office while Mr. Deas walked out the front entrance of the hospital. Ms. Perry was waiting for him; he got into her car and she drove him to his second job.
Sometime later that evening, Ms. Perry met defendant at another gas station to pick up one of the children. While at the gas station, defendant told Ms. Perry that Mr. Deas was a "crack head" and pleaded with her to get back together with him.
Later that night, defendant called Ms. Perry on her cell phone, but she did not pick up. Around 11:00 p.m., defendant, his brother, and his nephew, started driving past Ms. Perry's mother's house, where Ms. Perry lived, to see if her car was there. On at least two occasions, they saw that her car was in the driveway and drove back home. When they drove past the house the final time, around midnight, Ms. Perry's car was not in the driveway, so they decided to drive to Mr. Deas' residence to look for Ms. Perry.
Around 11:30 p.m. on 18 October 2007, Ms. Perry left her children at her mother's house and went to pick up Mr. Deas from his night job. Ms. Perry picked up Mr. Deas from work around midnight and they smoked some marijuana before driving to Mr. Deas' sister's house, where he lived. Mr. Deas went inside to take a shower while Ms. Perry waited in her car. When he came back outside, he and Ms. Perry had sex in her car. Afterward, Ms. Perry heard a noise at the end of the street and tried to dress quickly, afraid that it was defendant. Defendant, with his brother and nephew passed out in the car, drove past Ms. Perry's car and parked behind her. She tried to start the car to leave because she was afraid of what might happen, but Mr. Deas started getting out of the car to go inside the house. Defendant got out of his car, walked up to Mr. Deas, said "Hey, Rich," and then shot him three times in the chest from "an arm's length away." Defendant then got back into his car, after hesitating for a moment, and drove away.
Ms. Perry called 911 and at approximately 1:54 a.m. on 19 October 2007, officers with the Charlotte-Mecklenburg Police Department arrived, as well as an ambulance. The paramedics pronounced Mr. Deas dead at 1:57 a.m. Ms. Perry told the police that defendant shot Mr. Deas and gave them defendant's address. Later that morning, police went to defendant's residence; defendant was not arrested, but went with the police to the police station for questioning. At the police station, defendant gave a statement that he had, in fact, shot Mr. Deas.
Defendant was charged with the first degree murder of Mr. Deas. Defendant pled not guilty and the case proceeded to trial. During trial, the State sought to introduce through Ms. Diggs-Harrison's testimony Mr. Deas' statement that defendant had threatened to kill him during the confrontation outside the hospital on 18 October 2007. Defendant objected to the testimony, arguing that the statement was hearsay not within an exception. After conducting a voir dire, the trial court ruled that the statement was admissible as an excited utterance. The jury found defendant guilty of first degree murder and the trial court sentenced defendant to life imprisonment without parole. Defendant timely appealed to this Court.

I
Defendant first argues that the trial court improperly allowed Ms. Diggs-Harrison to testify, over defendant's objection, that Mr. Deas told her that defendant threatened to kill him during the confrontation outside the hospital. Specifically, Ms. Diggs-Harrison testified that Mr. Deas told her:
"I just had a fight with this nigger up at the staff entrance about a bitch, and it wasn't even like that. And I told him he needed to talk to his girl because it's not even like that. And he was saying like  he told me if it wasn't so many people around he would kill me now."
Defendant argues on appeal, as he did at trial, that this statement constitutes inadmissible hearsay.[1]
"Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. R. Evid. 801(c). Hearsay is generally inadmissible unless it comes within an exception. N.C. R. Evid. 802; State v. Valentine, 357 N.C. 512, 515, 591 S.E.2d 846, 851 (2003). Here, after conducting a voir dire of Ms. Diggs-Harrison, the trial court ruled that Mr. Deas' statement was admissible under the "excited utterance" exception to the hearsay rule. The trial court's determination as to whether an out-of-court statement is admissible pursuant to an exception to the hearsay rule is reviewed de novo on appeal. State v. Wilson, ___ N.C. App. ___, ___, 676 S.E.2d 512, 515, disc. review denied, ___ N.C. ___, 684 S.E.2d 158 (2009).
Rule 803(2) of the Rules of Evidence defines an "excited utterance" as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." N.C. R. Evid. 803(2). The rationale behind the excited utterance exception is that "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces `spontaneous and sincere' utterances." State v. Reid, 335 N.C. 647, 662, 440 S.E.2d 776, 784 (1994) (quoting 6 John H. Wigmore, Evidence § 1747(I) (James H. Chadbourn ed., 1976)). To fall within this exception, "the proponent must establish that there was `(1) a sufficiently startling experience suspending [the declarant's] reflective thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication.'" State v. Wilkerson, 363 N.C. 382, 417, 683 S.E.2d 174, 195 (2009) (quoting State v. Smith, 315 N.C. 76, 86, 337 S.E.2d 833, 841 (1985)).
Here, the surveillance tape presented at trial showed that the confrontation between defendant, his brother and nephew, and Mr. Deas ended at approximately 4:14 p.m. and Ms. Diggs-Harrison testified that she saw Mr. Deas running down the escalator between 4:10 and 4:20 p.m. Thus, the span of time between the threat to kill Mr. Deas  a startling event  and his statement to Ms. Diggs-Harrison was as short as a few seconds and as long as six minutes. Ms. Diggs-Harrison testified that Mr. Deas "looked angry, had a frown on his face, he was sweating and he was running down the escalator, as opposed to riding down." She also stated that Mr. Deas did not "seem like his normal self": he talked loudly, appeared agitated, and used terms  "nigger" and "bitch"  that she had never heard him use in the 12 years she had known him. This evidence supports the trial court's determination that Mr. Deas' statement was admissible as an excited utterance under Rule 803(2). See State v. Applewhite, 190 N.C. App. 132, 139-40, 660 S.E.2d 240, 245 (2008) (holding that homicide victim's statement to fiancée regarding encounter with defendant where defendant pointed a gun at victim and followed him home constituted "excited utterance" where statements were made within 15 to 20 minutes of encounter and victim seemed scared and upset).
Defendant nonetheless argues that Mr. Deas' statement should not have been admitted because Mr. Deas was not trustworthy. Contrary to defendant's argument, the focus is on the "trustworthiness" of the statement itself, not the declarant. See Reid, 335 N.C. at 662, 440 S.E.2d at 784 ("`[T]he trustworthiness of this type of utterance lies in its spontaneity . . . .'" (quoting 2 Kenneth S. Broun, Brandis & Broun on North Carolina Evidence § 216 (4th ed. 1993))). Whether the declarant himself is reliable is an issue of credibility for the jury and is immaterial when a statement qualifies as an excited utterance.
Defendant further argues that Mr. Deas' statement was inadmissible because "[Mr.] Deas did not identify the declarant in his anger-driven tirade to Ms. Diggs-Harrison." Defendant relies on State v. Sibley, 140 N.C. App. 584, 537 S.E.2d 835 (2000), in support of his contention.
Sibley, however, is inapposite. The issue in Sibley, where the defendant was convicted of possession of a firearm by a felon, was whether "videotapes bearing the date, `1/10/98,' appearing on the lower lefthand corner" fit within an exception to the general rule prohibiting hearsay. Id. at 587, 537 S.E.2d at 838. This Court held that the videotapes were inadmissible hearsay: "Here, the declarant is unknown. There is no testimony as to the identity of the operator of the camera. The statement, that this video was filmed on 1/10/98, is offered for its truth, [i.e.], that defendant was in possession of a weapon on that date." Id. at 587, 537 S.E.2d at 838. Here, in contrast to Sibley, the declarant is known: the declarant of the excited utterance is Mr. Deas.
To the extent that defendant argues that Mr. Deas' statement is inadmissible because it does not directly identify defendant as the person who made the threat, the trial court determined that there was sufficient evidence from which "the jury may conclude that the statement was made by the Defendant." As the State argued at trial in support of the admission of Mr. Deas statement, as relayed by Ms. Diggs-Harrison, Mr. Deas stated that "he"  the person making the threat  "needed to talk to his girl." (Emphasis added.) The evidence at trial also tended to show that defendant, his brother, and his nephew confronted Ms. Perry and Mr. Deas at the hospital entrance. Of these three, only defendant had been in a 10 year relationship with Ms. Perry, only defendant had four children with Ms. Perry, and only defendant had, as recently as that evening, expressed a desire to get back together with Ms. Perry. Although defendant argues that the evidence could support a finding by the jury that either his brother or nephew could have made the threat, there is also evidence that would support an inference that defendant was the one who threatened Mr. Deas. See State v. Edwards, 89 N.C. App. 529, 531, 366 S.E.2d 520, 522 (1988) ("Inconsistencies and contradictions in the State's evidence are a matter for the jury to consider and resolve."). As the trial court noted, defense counsel could "certainly cross examine [Ms. Diggs-Harrison] about [whether Mr. Deas identified defendant as the person who threatened him] and the jury may reach a different conclusion."
Assuming that Mr. Deas' statement was inadmissible hearsay, defendant bears the burden of establishing on appeal that the error was prejudicial. As defendant does not assert constitutional error, he must demonstrate that, absent the purported error, "a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443(a) (2009); accord State v. Hickey, 317 N.C. 457, 473, 346 S.E.2d 646, 657 (1986) (stating that "erroneous admission of hearsay is not always so prejudicial as to require a new trial").
Defendant contends that he "suffered prejudice from the admission of the statement" as the State was able to use the threat to "show[] [defendant's] premeditation and deliberation." Defendant was convicted of first degree murder, which is the "unlawful killing of a human being with malice, premeditation, and deliberation." State v. Truesdale, 340 N.C. 229, 234, 456 S.E.2d 299, 302 (1995). A killing is "premeditated" if "the defendant formed the specific intent to kill the victim some period of time, however short, before the actual killing." State v. Bonney, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991). "Deliberation," in turn, "means an intent to kill executed by the defendant in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." Id.
In determining whether a killing was committed with premeditation and deliberation, our Supreme Court has set out a list of non-exclusive factors for consideration: (1) lack of provocation by the victim; (2) conduct and statements of the defendant before and after the killing; (3) threats or declarations of the defendant before and during the occurrence resulting in the death; (4) animosity or previous difficulty between the parties; (5) dealing lethal blows after the victim has been rendered helpless; (6) evidence that the killing was done in a brutal manner; and (7) the nature and number of the victim's wounds. State v. Hamlet, 312 N.C. 162, 170, 321 S.E.2d 837, 843 (1984).
Here, assuming Mr. Deas' statement regarding defendant's threat should have been excluded, the evidence at trial tends to establish that defendant wanted to get back together with Ms. Perry and that they had fought on 18 October 2007 when defendant called Mr. Deas a "crack head." After the argument, defendant, along with his brother and nephew, went to Ms. Perry's work to "mess with her." Seeing Ms. Perry picking up Mr. Deas at the staff entrance of the hospital, defendant, his brother, and his nephew got out of their car and confronted Ms. Perry and Mr. Deas, talking aggressively to them. Both Ms. Perry and Mr. Deas felt "intimidated" and were "scared" by the confrontation.
Later that night, after the confrontation, defendant repeatedly drove past Ms. Perry's house to see if she were there, and, when he discovered that her car was gone, he drove with a gun to the residence where he knew Mr. Deas lived. When defendant spotted Ms. Perry's car, he pulled in behind her's. As Mr. Deas was getting out of the passenger door of Ms. Perry's car to go inside the house, defendant got out of his car, walked up to Mr. Deas, said sarcastically, "Hey, Rich," and then shot him three times in the chest from "an arm's length away."
In light of this evidence tending to establish premeditation and deliberation, defendant has failed to demonstrate that there is a reasonable possibility that the exclusion of Mr. Deas' hearsay statement would have produced a different result at trial. Thus, even if the trial court erred in admitting the statement, the error was harmless. Defendant's argument is overruled.

II
Defendant next argues that the trial court committed reversible error by permitting the prosecutor to "point[] out to the jury" during closing arguments that "[defendant] had remained silent and that he had failed to prove to the jury that someone else committed the crime." Defendant assigns as error the following statement by the prosecutor, which defendant claims is an improper comment on his constitutional right not to present evidence in his defense:
You have heard absolutely no evidence to support that [defendant's] brother or his cousin,[2] either[,] one[,] had a motive to commit this crime, or two, had an opportunity or an ability to commit this crime.
"The scope of jury arguments is left largely to the control and discretion of the trial court . . . ." State v. Call, 349 N.C. 382, 419, 508 S.E.2d 496, 519 (1998). The prosecutor, as well as defense counsel, is entitled to argue the evidence presented and all reasonable inferences that flow from that evidence. State v. Mann, 355 N.C. 294, 307, 560 S.E.2d 776, 785, cert. denied, 537 U.S. 1005, 154 L. Ed. 2d 403 (2002). Where, as here, "the defendant failed to object to the allegedly improper remarks at trial, the question . . . on review is whether the remarks complained of were so grossly improper as to require the trial court's intervention ex mero motu." Id. In order to conclude that the trial court abused its discretion in not intervening ex mero motu, the defendant must show that the prosecutor's statements were "grossly improper," "infect[ing] the trial with unfairness that .. . rendered the conviction fundamentally unfair." State v. Davis, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998), cert. denied, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999). In assessing the impropriety of the prosecutor's statements, they must be considered "in the context in which they were made and in light of the overall factual circumstances to which they referred." Call, 349 N.C. at 420, 508 S.E.2d at 519.
A defendant's election to exercise his Fifth Amendment protection against self-incrimination may not be used against the defendant. State v. Baymon, 336 N.C. 748, 758, 446 S.E.2d 1, 6 (1994). Thus, any comment by the State directed towards the defendant's failure to testify or present evidence violates the defendant's constitutional rights. Id. "A statement that may be interpreted as commenting on a defendant's decision not to testify is improper if the jury would naturally and necessarily understand the statement to be a comment on the failure of the accused to testify." State v. Mitchell, 353 N.C. 309, 326, 543 S.E.2d 830, 840-41, cert. denied, 534 U.S. 1000, 151 L. Ed. 2d 389 (2001).
Our courts have held, however, that the State is permitted to comment on a defendant's failure to produce exculpatory evidence or to contradict evidence that the State has presented. See, e.g., State v. Reid, 334 N.C. 551, 555, 434 S.E.2d 193, 196 (1993) (concluding that although the prosecutor may not "comment[] upon the defendant's failure to testify," the prosecutor may "comment on a defendant's failure to produce witnesses or exculpatory evidence to contradict or refute evidence presented by the State" (internal citation and quotation marks omitted)); State v. Jordan, 305 N.C. 274, 280, 287 S.E.2d 827, 831 (1982) ("Although the defendant's failure to take the stand and deny the charges may not be the subject of comment, the defendant's failure to produce exculpatory evidence or to contradict evidence presented by the State may properly be brought to the jury's attention by the State in its closing argument."); State v. Cobb, 150 N.C. App. 31, 38, 563 S.E.2d 600, 606 ("[O]ur Courts have consistently held that the State is permitted to comment on a defendant's failure to produce exculpatory evidence or to contradict evidence which the State has presented."), disc. review denied, 356 N.C. 169, 568 S.E.2d 618 (2002).
Here, in this case, considering the prosecutor's statements in their context, they are not a comment on defendant's failure to testify, but rather on his failure to present exculpatory evidence or evidence that would contradict the State's. The prosecutor's statement simply summarizes the State's uncontradicted evidence that no one else had the motive, ability, and opportunity to commit the crime. This statement was neither a direct nor inferential comment on defendant's constitutionally protected right to refuse to testify. See State v. Mason, 317 N.C. 283, 287, 345 S.E.2d 195, 197 (1986) (concluding prosecutor's statement that "there was `nothing else from this witness stand'" to contradict State's evidence was not improper comment on defendant's right to refuse to testify). Defendant's argument is, therefore, overruled.

III
Defendant's final argument on appeal is that the trial court committed plain error by failing to instruct the jury on voluntary manslaughter as a possible verdict in addition to first and second degree murder. Defendant argues that he is entitled to have the jury instructed on voluntary manslaughter because he shot Mr. Deas in the "heat of passion," after seeing Mr. Deas and Ms. Perry, his long-time girlfriend, having sex in Ms. Perry's car.
Contrary to defendant's argument, our courts have "consistently held that `when a jury is properly instructed on both first-degree and second-degree murder and returns a verdict of guilty of first-degree murder, the failure to instruct on voluntary manslaughter is harmless error.'" State v. Locklear, 349 N.C. 118, 153-54, 505 S.E.2d 277, 298 (1998) (quoting State v. East, 345 N.C. 535, 553, 481 S.E.2d 652, 664, cert. denied, 522 U.S. 918, 139 L. Ed. 2d 236 (1997)), cert. denied, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999); accord State v. Coleman, 161 N.C. App. 224, 233, 587 S.E.2d 889, 895 (2003) ("In instances where a trial court has submitted to the jury the possible verdicts of first degree murder based on premeditation and deliberation, second degree murder, and not guilty, our Supreme Court has `adopted the rule that . . . a verdict of first-degree murder based on premeditation and deliberation renders harmless the trial court's improper failure to submit voluntary or involuntary manslaughter.'" (quoting State v. Price, 344 N.C. 583, 590, 476 S.E.2d 317, 321 (1996)). Thus, even assuming the evidence at trial supported an instruction on voluntary manslaughter,[3] the jury's finding defendant guilty of first degree murder and its rejecting second degree murder "renders any error harmless." Locklear, 349 N.C. at 154, 505 S.E.2d at 298. This assignment of error is overruled.
No Error.
Judges CALABRIA and HUNTER, Robert N., Jr. concur.
Report per Rule 30(e).
NOTES
[1] We note that although defendant also assigned error to the admission of this evidence on the basis of N.C. R. Evid. 403, defendant makes no specific argument that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. This assignment of error is, consequently, "taken as abandoned." N.C. R. App. P. 28(b)(6).
[2] It appears from the record that the prosecutor mistakenly referred to defendant's cousin rather than his nephew, Mr. Jackson.
[3] Review of the record indicates that the only evidence presented at trial on this issue is defendant's recorded statement to police that when he drove by Mr. Deas' sister's house, he had only seen Ms. Perry in the car, had not seen Mr. Deas in the car, and "hadn't seen nothing" happening in the car. There is thus no evidence that would support the trial court's giving an instruction on voluntary manslaughter as a possible alternative verdict.