IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-133

No. COA21-150

Filed 1 March 2022

Johnston County, Nos. 18 CRS 56087-88; 19 CRS 39-43

STATE OF NORTH CAROLINA

v.

CHARLES ROBERT GUIN, JR., Defendant.

Appeal by Defendant from judgments entered 25 February 2020 by Judge Keith O. Gregory in Johnston County Superior Court. Heard in the Court of Appeals 1 December 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Brian D. Rabinovitz, for the State.*

*Joseph P. Lattimore for Defendant.*

GRIFFIN, Judge.

¶ 1      Defendant Charles Robert Guin, Jr., appeals from the trial court's judgments entering jury verdicts finding Defendant guilty of criminal charges arising from a domestic dispute between Defendant and his wife. Defendant contends the trial court (1) committed plain error by failing to instruct the jury on attempted voluntary manslaughter as a lesser-included offense of first-degree murder; (2) failed to ensure that Defendant knowingly consented to defense counsel's alleged concessions of guilt

to multiple assault charges; and (3) erred by denying Defendant's motion to dismiss the charge of first-degree kidnapping because there was insufficient evidence distinct from evidence supporting assault. We discern no error.

## I.   Factual and Procedural Background

This case arises from a domestic violence incident between Defendant and his wife, Ms. Gaster, during the night of 29 September 2018. On 14 January 2019, a grand jury indicted Defendant for seven crimes arising from that domestic violence incident: (1) attempted first-degree murder, (2) first-degree kidnapping, (3) assault with a deadly weapon with intent to kill or inflict serious bodily injury ("AWDWIKISI"), (4) assault inflicting serious bodily injury, (5) assault by strangulation, (6) violation of a domestic violence protective order, and (7) habitual misdemeanor assault. Evidence at trial tended to show as follows:

Defendant and Ms. Gaster met and began to date in 2014 while both attended a substance abuse treatment class. Defendant and Ms. Gaster moved in together. During this time, Defendant and Ms. Gaster purchased and consumed drugs together. Defendant became paranoid about the couple's drug use, frequently accusing Ms. Gaster of hiding or overusing their drugs, slapping Ms. Gaster, and subjecting Ms. Gaster to verbal abuse.

On 12 October 2016, Defendant and Ms. Gaster married. Defendant's verbal and physical abuse of Ms. Gaster continued into their marriage. The abuse often

resulted in police involvement, Ms. Gaster needing medical attention, or both.  On one occasion, Ms. Gaster recalled that Defendant accused her of cheating, physically assaulted her, and tied her to a tree.  Ms. Gaster acquired a domestic violence protective order ("DVPO") against Defendant in August 2018.

¶ 5        On 29 September 2018, despite the DVPO, Ms. Gaster agreed to pick Defendant up from work to have a "friendly visit."  The couple returned to Ms. Gaster's apartment around 10:30 p.m., where they consumed drugs and alcohol. After about an hour had passed, Defendant accused Ms. Gaster of cheating and began to physically assault her.  Defendant forced Ms. Gaster to sit on her bed, then discovered that she had hidden knives under her pillow.

¶ 6        Defendant searched Ms. Gaster's apartment and found more knives hidden in each room.  Defendant "hit [Ms. Gaster], slapped [her] across the face, and asked [her] what was [she] doing so wrong in [her] life that [she] needed to protect [her]self like that[?]" Ms. Gaster testified that Defendant "started curling [her] hair up in his hand so he could hold [her] face to his," demanded that she admit to cheating, and dragged her "back and forth from the kitchen to the bedroom" by her hair.  Ms. Gaster explained that Defendant said he "was going to chop [her] up where nobody would find [her] body," "he turned the water on really loud, really on high," and he "turned the air condition[ing]—or heat on to where the fan was constantly running so no one would hear [her] scream."  Ms. Gaster "thought [she] was going to die that night."

Defendant eventually "drug [Ms. Gaster] back in the bedroom" and beat her in the head until she "started seeing bright lights." Ms. Gaster remembered that Defendant "had thrown the knives up on the dresser, and [she] reached behind [her] and [she] grabbed one." Ms. Gaster "pushed the knife into [Defendant], and he let go of [her]." Defendant "pulled the knife out, and [Ms. Gaster] pushed it back in him." Ms. Gaster attempted to escape the bedroom, but Defendant "grabbed [her] by [her] hair and pulled [her] back in and started beating [her] some more." Defendant continued to beat Ms. Gaster, choke her, and kick her in her stomach and ribs for the rest of the night.

Ms. Gaster testified that, when Defendant eventually left her alone, she "could hear the birds chirping, so she knew it was morning." Ms. Gaster crawled out of her back door and sought help from a neighbor, who called for an ambulance. Ms. Gaster was treated in the trauma unit and hospitalized for about six days. The hospital trauma center treated Ms. Gaster for "extensive swelling and bruising to face and neck[,]" fractures to rib bones and bones around her eyes, strangulation, contusions, and kidney failure induced by toxins released from "skeletal muscle destruction."

According to Defendant's testimony at trial, he and Ms. Gaster bought drugs and alcohol, then went to Ms. Gaster's apartment on 29 September 2018. Defendant explained that he placed the knives on top of the dresser because Ms. Gaster coaxed him into the bedroom and asked him to "lift up the mattress and give [sic] them five

butcher knives up under the bed." Defendant and Ms. Gaster then consumed drugs on the mattress. Defendant placed his portion of the drugs beside him on the mattress, looked away for a second, then could not find the drugs when he looked back down at the mattress. Ms. Gaster insisted that they search for the drugs, but Defendant knew she had taken them because "she was trying to get [him] to put [his] hands on her." Defendant testified that he "had just spent a year in jail and three months in prison[,]" he "had been out three weeks, and there was no way in the world [he] was going to put [his] hands on this lady, because [he] knew [he] would go to jail."

¶ 10        Defendant then attempted to leave, but Ms. Gaster kept "antagonizing" him, "reached across the dresser, picked up the butcher knife[,]" and stabbed him in "both lungs." Defendant explained he "was bleeding like a stuck hog" and "thought [he] was going to die." Defendant testified,

> And after she stabbed me, I'll be honest with you, I lost my cool. I come back to a couple of hours later and I beat the hell out of her. I'm not -- I'm guilty of that. I'm guilty of beating that woman, but I did not try to kill her. She knows I didn't try to kill her.
>
> After I quit beating her, I come to, and I knew right then. I said, oh, Lord. I looked at her and said, "Look what you caused me to do because you stabbed me and I beat the hell out of you."

¶ 11        Defendant then left the apartment and sought medical attention in Tennessee because he thought he would be left injured in jail without medical care if he stayed

in North Carolina. Defendant said that Ms. Gaster was lucid when he left and she just waited twelve hours to seek medical attention herself.

¶ 12 Following the jury trial, the jury convicted Defendant of all charges, other than habitual misdemeanor assault. The trial court arrested judgment on Defendant's assault inflicting serious injury and assault by strangulation charges. The trial court sentenced Defendant to four consecutive sentences totaling 578 to 730 months. Defendant timely appeals.

## II.    Analysis

¶ 13 Defendant challenges each of his convictions on appeal, arguing (1) the trial court should have instructed the jury on a lesser-included offense of attempted first-degree murder; (2) the trial court did not ensure Defendant had knowingly consented before allowing defense counsel to concede Defendant's guilt to multiple charges; and (3) the State failed to present evidence of confinement supporting kidnapping that was distinct from evidence supporting the charges of assault. We address each argument in turn.

### A. Jury Instruction on Lesser-Included Offense

¶ 14 Defendant contends "the trial court committed plain error in failing to instruct the jury on the lesser-included offense of attempted voluntary manslaughter" because the evidence showed Defendant lacked the requisite intent for attempted first-degree murder.

Defendant did not request a jury instruction on attempted voluntary manslaughter at trial, or otherwise object to the jury instructions given by the trial court. "A trial court must give instructions on all lesser-included offenses that are supported by the evidence, even in the absence of a special request for such an instruction; and the failure to so instruct constitutes reversible error that cannot be cured by a verdict finding the defendant guilty of the greater offense." *State v. Lawrence*, 352 N.C. 1, 19, 530 S.E.2d 807, 819, *judgment entered*, 352 N.C. 595, 544 S.E.2d 565 (2000).

Nonetheless, because "[D]efendant did not object to the trial court's instructions or request an instruction on lesser-included offenses, we must review this assignment under the 'plain error' standard[.]" *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993) (citation omitted). To amount to plain error, "the error in the trial court's jury instructions must be 'so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached.'" *Id.* (citation omitted).

"[A] defendant is entitled to have all lesser degrees of offenses supported by the evidence submitted to the jury as possible alternate verdicts." *State v. Palmer*, 293 N.C. 633, 643–44, 239 S.E.2d 406, 413 (1977). "The test is whether there 'is the presence, or absence, of any evidence in the record which might convince a rational trier of fact to convict the defendant of a less grievous offense.'" *State v. Thomas*, 325

N.C. 583, 594, 386 S.E.2d 555, 561 (1989) (citation omitted). "However, the trial court is not required to submit lesser degrees of a crime to the jury 'when the State's evidence is positive as to each and every element of the crime charged and there is no conflicting evidence relating to any element of the charged crime.'" *State v. McKinnon*, 306 N.C. 288, 300–01, 293 S.E.2d 118, 126 (1982) (citation omitted). "When the State's evidence establishes 'each and every element of first-degree murder and there is no evidence to negate these elements, it is proper for the trial court to exclude [a lesser-included offense] from the jury's consideration.'" *State v. Thibodeaux*, 352 N.C. 570, 582, 532 S.E.2d 797, 806 (2000) (citation omitted).

¶ 18     To show an "attempt" crime, the State must show "(1) the intent to commit the substantive offense, and (2) an overt act done for that purpose which goes beyond mere preparation, but (3) falls short of the completed offense." *State v. Miller*, 344 N.C. 658, 667, 477 S.E.2d 915, 921 (1996) (citation omitted). "The [substantive] elements of first-degree murder are: (1) the unlawful killing, (2) of another human being, (3) with malice, and (4) with premeditation and deliberation." *State v. Coble*, 351 N.C. 448, 449, 527 S.E.2d 45, 46 (2000) (citation omitted). Because it is difficult to prove a defendant's specific mental intent by direct evidence, our Courts have found the following types of circumstantial evidence show premeditation and deliberation:

> (1) absence of provocation on the part of the deceased, (2)

the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*State v. Olson*, 330 N.C. 557, 565, 411 S.E.2d 592, 596 (1992) (citation omitted).

¶ 19 North Carolina also recognizes attempted voluntary manslaughter. *State v. Rainey*, 154 N.C. App. 282, 289, 574 S.E.2d 25, 30, *writ denied, review denied*, 356 N.C. 621, 575 S.E.2d 520 (2002). "[V]oluntary manslaughter is an intentional killing without premeditation, deliberation or malice but done in the heat of passion suddenly aroused by adequate provocation or in the exercise of imperfect self-defense where excessive force under the circumstances was used or where the defendant is the aggressor." *State v. Wallace*, 309 N.C. 141, 149, 305 S.E.2d 548, 553 (1983) (citation omitted). The "specific intent [of first-degree murder] is either excused, justified, or negated by heat of passion arising under sudden and adequate provocation." *Rainey*, 154 N.C. App. at 287, 574 S.E.2d at 28. Attempted voluntary manslaughter is a lesser-included offense of attempted first-degree murder. *See id.* at 289, 574 S.E.2d at 29.

¶ 20 Defendant does not contend the State failed to show that he took overt acts which could have caused Ms. Gaster's death but fell short of that completed offense.

Defendant argues only that the State failed to conclusively prove he had the requisite intent of premeditation and deliberation to commit first-degree murder because evidence at trial showed that he assaulted Ms. Gaster spontaneously in response to adequate provocation. We disagree.

The State presented the following evidence at trial supporting premeditation and deliberation: Defendant was upset with Ms. Gaster when she picked him up that evening and continued to accuse her of infidelity throughout the night. *See State v. Pridgen*, 313 N.C. 80, 94, 326 S.E.2d 618, 627 (1985) (including prior ill-will between the victim and the defendant over the victim's planned actions as evidence of premeditation and deliberation).

After the assault, Defendant did not call the police or seek medical attention for Ms. Gaster. Rather, Defendant left North Carolina and fled to Tennessee to seek medical attention for himself. *State v. Sierra*, 335 N.C. 753, 759, 440 S.E.2d 791, 795 (1994) (finding as evidence for premeditation and deliberation that the defendant left his victim to die and instead cared for his own needs).

There was a history of mental, physical, and emotional abuse between Defendant and Ms. Gaster. Ms. Gaster testified that Defendant routinely threatened her with violence during their relationship. In one instance, Defendant previously threatened Ms. Gaster while he was in prison that he would "go postal on you and all your friends" when he thought she cheated on him. *See State v. Potter*, 295 N.C. 126,

131, 244 S.E.2d 397, 401 (1978) (holding the defendant's earlier threats against the victim were evidence permitting inference of premeditation and deliberation). The State presented evidence that Ms. Gaster had previously suffered broken bones as a result of this abuse and was once tied to a tree. *See State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991) (noting prior instances of physical abuse and arguments between the victim and the defendant as evidence of premeditation and deliberation). The record shows that Defendant's history of abuse was sufficient for Ms. Gaster to seek and obtain a DVPO against Defendant in August 2018. Further, Ms. Gaster testified that, during the September 29 assault, Defendant threatened that he "was going to chop [her] up where nobody would find [her] body."

¶ 24    The State's evidence tended to show Defendant's assault on Ms. Gaster on September 29 was lengthy and excessively brutal. Defendant began assaulting Ms. Gaster no later than 3:00 a.m. that night. During the assault, Defendant beat Ms. Gaster with his fists, pulled her up by her hair, and kicked her while she lied on the floor. Defendant continued to assault Ms. Gaster until the sun rose the next morning and Ms. Gaster could hear the birds chirping. *See State v. Vause*, 328 N.C. 231, 239, 400 S.E.2d 57, 62 (1991) (finding sufficient evidence of premeditation and deliberation where the defendant excessively beat female murder victim, shoved her around her home, and paused during assault); *State v. Barts*, 321 N.C. 170, 177, 362 S.E.2d 235, 239 (1987) (holding evidence "that multiple injuries had been inflicted

upon the victim in a particularly brutal and vicious beating" was "sufficient evidence from which premeditation and deliberation could be inferred").

¶ 25        When Ms. Gaster sought medical treatment, her face was bleeding and her eyes were swollen shut.  Ms. Gaster's injuries were so severe that she had to be treated at a trauma center for broken bones, strangulation, and force-induced kidney failure.  *See State v. Robbins*, 319 N.C. 465, 511–12, 356 S.E.2d 279, 306 (1987) ("[T]he nature and number of the victim's wounds is a circumstance from which premeditation and deliberation can be inferred." (citation omitted)).  This evidence was sufficient to show premeditation and deliberation.

¶ 26        Defendant contends that his testimony that he began to assault Ms. Gaster only after she stabbed him in the chest shows that he acted with adequate provocation, directly contradicted the evidence recounted above, and therefore created a question of fact regarding his intent which warranted a jury instruction on attempted voluntary manslaughter.  *See, e.g., State v. McConnaughey*, 66 N.C. App. 92, 96, 311 S.E.2d 26, 29 (1984) (finding evidence supported a verdict of voluntary manslaughter where the victim attacked the defendant first and the defendant shot the victim in the ensuing altercation).  However, Defendant's evidence did not excuse, justify, or negate the other overwhelming evidence at trial supporting premeditation and deliberation.  "One may deliberate, may premeditate, and may intend to kill after premeditation and deliberation, although prompted and, to a large extent, controlled

by passion at the time." *Bonney*, 329 N.C. at 77, 405 S.E.2d at 154 (citation omitted).

Ms. Gaster admitted during trial that she stabbed Defendant in the chest with a knife. Nonetheless, Defendant's testimony confirmed that the subsequent assault lasted multiple hours. Defendant testified that he "knew what [he] was doing" and agreed in response to numerous questions from the State that he "could have left at any time." Defendant's testimony did not warrant an instruction on attempted voluntary manslaughter, and it is unlikely that the trial court's alleged failure to instruct the jury on attempted voluntary manslaughter had a probable impact on the jury's decision. The trial court did not commit error, much less plain error, by failing to instruct the jury *ex mero motu* on the lesser-included offense of voluntary manslaughter.

## B. Concession of Guilt by Defense Counsel

Defendant argues that this Court should remand to the trial court because Defendant's counsel provided ineffective assistance when she "conceded that [Defendant] committed all charged offenses . . . except Attempted First Degree Murder" and "the trial judge [did not] conduct the required inquiry with [Defendant] to ensure voluntary and knowing consent to these admissions of guilt." This Court reviews whether a defendant received effective assistance of counsel, including alleged improper concessions of a defendant's guilt by defense counsel, *de novo*. *State v. Foreman*, 270 N.C. App. 784, 788, 842 S.E.2d 184, 187–88 (2020).

¶ 29        In *State v. Harbison*, our Supreme Court established the rule that "ineffective assistance of counsel, *per se* in violation of the Sixth Amendment [of the U.S. Constitution], has been established in every criminal case in which the defendant's counsel admits the defendant's guilt to the jury without the defendant's consent." *State v. Harbison*, 315 N.C. 175, 180, 337 S.E.2d 504, 507–08 (1985). In *Harbison*, the defendant's counsel specifically asked the jury to find the defendant guilty of one charge instead of another, stating: "I think you should find [Defendant] guilty of manslaughter and not first degree [murder]." *Id.* at 178, 337 S.E.2d at 506. The trial court did not inquire whether, and no evidence in the record showed, the defendant knowingly and voluntarily agreed to defense counsel's request. *Id.* The Court explained that "[w]hen counsel admits his client's guilt without first obtaining the client's consent, the client's rights to a fair trial and to put the State to the burden of proof are completely swept away." *Id.* at 180, 337 S.E.2d at 507. "[W]hen counsel to the surprise of his client admits his client's guilt, the harm is so likely and so apparent that the issue of prejudice need not be addressed." *Id.*

¶ 30        Our Supreme Court later extended *Harbison* to instances where defense counsel does not expressly request that the jury convict the defendant of a charge, but impliedly concedes the defendant's guilt to a charged offense. In *State v. McAllister*, the defendant was tried for assault on a female, assault by strangulation, second-degree sexual offense, and second-degree rape. *State v. McAllister*, 375 N.C.

455, 458—59, 847 S.E.2d 711, 714 (2020). In its case-in-chief, the State played for the jury a videotaped police interview with the defendant, in which the defendant admitted that he and the victim got into a rough "tussle," but he denied sexually assaulting her. *Id.* at 458, 847 S.E.2d at 713–14. The defendant also stated in the interview: "[I]f I smacked [her] ass up, then I smacked [her]; I can take the rap for that." *Id.*

¶ 31      During his closing argument, the defendant's counsel referenced the defendant's statements presented in the interview. Defense counsel reminded the jury that the defendant admitted "things got physical. You heard him admit that he did wrong. God knows he did." *Id.* at 473, 847 S.E.2d at 722. Defense counsel told the jury that the defendant "was being honest" during the interview. *Id.* at 460, 847 S.E.2d at 715. Throughout his closing argument, the defendant's "counsel never expressly mentioned [or asked the jury to find the defendant not guilty of] the charge of assault on a female but repeatedly addressed the other three charges against [the] defendant." *Id.* at 473, 847 S.E.2d at 722.

¶ 32      The Court in *McAllister* held that *Harbison* error occurs where counsel's statements "cannot logically be interpreted as anything other than an implied concession of guilt to a charged offense":

> [A] *Harbison* violation . . . encompass[es] situations in which defense counsel impliedly concedes his client's guilt without prior authorization.

. . .

[W]e expressly hold that such an implied admission of guilt can, in fact, constitute *Harbison* error.

. . .

Although an overt admission of the defendant's guilt by counsel is the clearest type of *Harbison* error, it is not the exclusive manner in which a *per se* violation of the defendant's right to effective assistance of counsel can occur. In cases where—as here—defense counsel's statements to the jury cannot logically be interpreted as anything other than an implied concession of guilt to a charged offense, *Harbison* error exists unless the defendant has previously consented to such a trial strategy. In such cases, the defendant is prejudiced in the same manner and to the same degree as if the admission of guilt had been overtly made. Thus, our decision in this case is faithful to the rationale underlying *Harbison*.

. . .

[U]nder *Harbison* and its progeny defense counsel was required to obtain the informed consent of [the] defendant before embarking on such a strategy that implicitly acknowledged to the jury his guilt of a separately charged offense.

*Id.* at 473, 475, 847 S.E.2d at 722, 723–24. The *McAllister* Court concluded that defense counsel's statements constituted error under *Harbison* as "an implied concession of guilt." *Id.* at 476, 847 S.E.2d at 724. The Court found no evidence that the defendant consented to his defense counsel's implied concession, and remanded to the trial court "for an evidentiary hearing . . . for the sole purpose of determining whether [the] defendant knowingly consented in advance to his attorney's admission of guilt to the assault on a female charge." *Id.* at 477, 847 S.E.2d at 725.

¶ 33        Defendant argues that statements made by his defense counsel during opening

and closing statements constituted an "implied admission of [his] guilt" identical to *McAllister* because counsel (1) told the jury that Defendant "beat" Ms. Gaster and (2) argued only against the charge of first-degree murder and did not mention Defendant's other charges in closing argument.

¶ 34    First, we disagree with Defendant's assertion that defense counsel's references to Defendant beating Ms. Gaster conceded his guilt to crimes of assault.  During opening statements, defense counsel told the jury:

> [Defendant] alleged that [Ms. Gaster] had been unfaithful to him. And you'll hear that he -- he wanted her to tell the truth, that he was going to give her 30 seconds to tell the truth.  And her response to "I'll give you 30 seconds" was she stabbed him twice in the abdomen.
>
> Now, this day that turned out to start off so normal, husband and wife spending quality time together, ended up with [Ms. Gaster] in a hospital in North Carolina and [Defendant] in a hospital in Tennessee.  Now, how did this come to be?  Well, there was only two people in that apartment.   [T]he evidence will show what happened between those walls and this couple was a *brutal, calculated assault* leaving blood-covered walls, bloodstained sheets, and broken furniture, we believe the evidence will show you that it's a result of this couple's very -- and I emphasize "very" – complicated relationship gone awry.

(Emphasis added).

¶ 35    Defendant points specifically to defense counsel's statement that a "brutal, calculated assault" occurred between Ms. Gaster and Defendant as a concession of

Defendant's guilt to his assault charges. We cannot agree. Defense counsel had referred only to Ms. Gaster's stabbing of Defendant before she made this statement. Defendant's theory in this case was that Ms. Gaster planned to stab him from the moment she picked him up that evening. According to Defendant's theory, Ms. Gaster completed a "brutal, calculated assault" when she stabbed him with the knife and all of the blood on those "blood-covered walls, blood-stained sheets" came from Defendant's wounds. Defense counsel's opening statement was not a concession of Defendant's guilt.

¶ 36     Defense counsel also made the following statements during closing arguments:

> [T]here's one thing that I need you to focus on about those days. There's not a question as to whether [Ms. Gaster] got beat.
> . . .
> Ladies and gentleman, that's what it comes down to – premeditation and deliberation. Did [Defendant], in a cool state, form the intent to murder and kill [Ms. Gaster]?
> . . .
> [Defendant] came up here and he told you in his words, "I beat the hell out of her."
> . . .
> I'm not asking you to award [Defendant] with Person of the Year. That, he is not. But what we are here to determine is whether or not he is guilty of attempting to murder [Ms. Gaster].
> . . .
> [Defendant] did not form the intent or premeditation and deliberation to kill [Ms. Gaster]. And because of that and that alone, we ask you to find him not guilty of doing so.

¶ 37     The Court in *McAllister* found the defendant's counsel's statements

problematic for three core reasons: "First, defense counsel attested to the accuracy of the admissions made by [the] defendant in his videotaped statement by informing the jurors that [the] defendant was 'being honest.'" *Id.* at 474, 847 S.E.2d at 722. "Second, [the] defendant's attorney not only reminded the jury that [the] defendant had admitted he 'did wrong' during the altercation in which [the victim] got 'hurt,' but defense counsel then proceeded to also state his own personal opinion that 'God knows he did [wrong]'—thereby implying that there was no justification for [the] defendant's use of force against [the victim]." *Id.* at 474, 847 S.E.2d at 723. Third, "at the very end of his closing argument, defense counsel asked the jury to find [the] defendant not guilty of every offense for which he had been charged except for the assault on a female offense." *Id.*

¶ 38        Here, Defense counsel's references to Defendant having beaten Ms. Gaster are distinguishable from the statements made in both *McAllister* and *Harbison*. These references do not depict a circumstance "when counsel to the surprise of his client admits his client's guilt." *Harbison*, 315 N.C. at 180, 337 S.E.2d at 507. In *McAllister*, the defendant's statements were introduced through a police interview presented by the State. In this case, Defendant chose to testify on his own behalf, under oath. Before taking the stand, Defendant confirmed that he was aware that he did not have to testify and that he would have to answer questions from both his counsel and the State truthfully. Defendant then repeatedly admitted that he beat Ms. Gaster:

> [Defendant]:  I beat the hell out of her.  . . .  I'm guilty of beating that woman.
>
> . . .
>
> [Defendant]:  I beat her for a period of time.  . . .  You're damn right I beat her.
>
> . . .
>
> [Defendant]:  I could have left at any time; you're right. But I don't know who in this room right here has the emotional and the ability to be stabbed by somebody you love and to know they're doing it on purpose to try to kill you that you can control your emotions when you hit them.
>
> . . .
>
> [Defendant]:  I did not deny that I beat her that night.

Defense counsel did not bolster the State's evidence or attest to the accuracy of Defendant's admissions.  Defense counsel repeated Defendant's own testimony, then urged the jury to evaluate the truth in Defendant's words.  Defense counsel repeatedly insisted that adequate provocation justified Defendant's use of force against Ms. Gaster and that provocation negated evidence of premeditation and deliberation.

¶ 39      Further, defense counsel's statement can logically be interpreted as a recitation of facts presented at trial.  Our Supreme Court has stated that "[a]dmitting a fact is not equivalent to an admission of guilt."  *State v. Wiley*, 355 N.C. 592, 620, 565 S.E.2d 22, 42 (2002) (citing *State v. Strickland*, 346 N.C. 443, 454, 488 S.E.2d 194, 200 (1997)).  In *State v. Strickland*, the defendant alleged that his defense counsel committed error under *Harbison* when counsel conceded that the defendant was holding a shotgun at the time the victim was shot by that shotgun.  *State v.*

*Strickland*, 346 N.C. 443, 454, 488 S.E.2d 194, 200 (1997). The *Strickland* Court

disagreed, holding that defense counsel's statement of an uncontroverted, material

fact was not equal to an admission of guilt to a criminal charge:

> We are persuaded that the statements made by defense
> counsel did not amount to an admission of defendant's
> guilt. The uncontroverted evidence in this case was that
> [the] defendant had been holding the gun when [the victim]
> was shot. Defense counsel's statements were not the
> equivalent of asking the jury to find [the] defendant guilty
> of any charge, and therefore, *Harbison* does not control.

*Id.* (citation omitted)

¶ 40        In this case, the uncontroverted evidence presented at trial by the State and

by Defendant's own testimony was that Defendant did use physical force against Ms.

Gaster on the night of 28 September 2018. Defendant repeatedly testified, "I beat the

hell out of her." Defendant also consistently maintained that he did not inflict serious

injury on Ms. Gaster, and insisted: "I never pulled her hair out and I never strangled

her. . . . Did I strangle her? No, I did not. Did I pull some of her hair out? No, I did

not." Defendant was charged with a number of "assault" charges, but each charge

required the State to provide additional evidence beyond the fact that a use of

physical force occurred. *See* N.C. Gen. Stat. § 14-32(A) (2017) (defining AWDWISIKI);

N.C. Gen. Stat. § 14-32.4 (2017) (defining assault inflicting serious bodily injury);

N.C. Gen. Stat. § 14-32.4(B) (defining assault by strangulation).

¶ 41        Defense counsel made no statements which could be construed as concessions

to the remaining elements necessary for the State to prove each charge of assault. Defense counsel's statements admitted, at most, a material fact relevant to crimes of assault. *State v. Arnett*, 2021-NCCOA-42, ¶ 42, 276 N.C. App. 106, 856 S.E.2d 123, 129 ("[D]efense counsel can admit an element of a charge without triggering a *Harbison* violation.").

¶ 42        This case is similar to the facts in *McAllister* in that defense counsel's omissions, rather than affirmative statements, are the basis for alleged error. In *McAllister*, defense counsel mentioned three out of the defendant's four charges in closing argument; the jury found the defendant guilty of the single unmentioned charge. *McAllister*, at 460–61, 847 S.E.2d at 715. Here, defense counsel mentioned one of Defendant's seven charges during closing argument; the jury found Defendant guilty of five of the six unmentioned charges. The Court in *McAllister* cautioned that "a finding of *Harbison* error based on an implied concession of guilt should be a rare occurrence" and stressed that their holding was appropriate based upon "the unique circumstances contained in the record" of the "unusual case" before the Court. *Id.* at 476, 847 S.E.2d at 724. Absent wholly similar "unique circumstances[,]" wherein defense counsel's affirmative statements either expressly or impliedly concede the defendant's guilt, we do not find a defense counsel's failure to mention the defendant's less severe charges to alone constitute *Harbison* error. The trial court did not err by allowing defense counsel to make the challenged statements without first conducting

an inquiry into Defendant's consent.

**C. Distinct Evidence of Confinement**

¶ 43        Defendant contends the trial court erred by denying his motion to dismiss the charge of first-degree kidnapping because "the State failed to introduce sufficient evidence of confinement separate from that which was inherent in the commission of the assaults on Ms. Gaster." We disagree.

¶ 44        We review the denial of a motion to dismiss *de novo*, to determine whether, in the light most favorable to the State, "there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Powell*, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980) (citation omitted). "When ruling on a motion to dismiss, the trial court should be concerned only about whether the evidence is sufficient for jury consideration, not about the weight of the evidence." *State v. Scott*, 356 N.C. 591, 596–97, 573 S.E.2d 866, 869 (2002) (citation omitted).

¶ 45        Under North Carolina law, the essential elements of first-degree kidnapping are: (1) the unlawful confinement, restraint, or movement from one place to another of any person age sixteen or older without their consent; (2) for the purpose of, inter alia, "[f]acilitating the commission of any felony" or "doing serious bodily harm to or terrorizing the person so confined, restrained or removed or any other person"; where (3) "the person kidnapped either was not released by the defendant in a safe place or

had been seriously injured or sexually assaulted[.]" *State v. Jerrett*, 309 N.C. 239, 260, 307 S.E.2d 339, 350 (1983) (citation omitted); N.C. Gen. Stat. § 14-39 (2017).

¶ 46        To avoid double jeopardy, "a kidnapping charge cannot be sustained if based upon restraint[, confinement, or movement] which is an inherent feature of another felony." *State v. Williams*, 308 N.C. 339, 346, 302 S.E.2d 441, 447 (1983). "The key question . . . is whether the kidnapping charge is supported by evidence from which a jury could reasonably find that the necessary restraint for kidnapping 'exposed [the victim] to greater danger than that inherent in the [underlying felony] itself, . . . [or] is . . . subjected to the kind of danger and abuse the kidnapping statute was designed to prevent.'" *State v. Pigott*, 331 N.C. 199, 210, 415 S.E.2d 555, 561 (1992) (citation omitted).

¶ 47        The State presented evidence that Defendant confined Ms. Gaster to her apartment through actions apart from confinement inherent in the many instances of assault. Ms. Gaster testified that "if [she] were able to get away" during the night of 28 September, she would "have gotten out of there and left[.]" But Defendant kept her there.

¶ 48        At some point, Defendant "ran over to the blinds[,] and he was trying to hang them back up so nobody could see what was going on inside." Ms. Gaster ran for the door of her bedroom, "was almost out[,] and he grabbed [her] by [her] hair and he pulled [her] back in and started beating [her] some more." The evidence allowed a

reasonable inference that Defendant chose to close the blinds and to wholly confine Ms. Gaster to her apartment to prevent her from seeking aid. *See State v. Newman*, 308 N.C. 231, 239, 302 S.E.2d 174, 180—81 (1983) (holding movement of rape victim from her car into the woods before sexual assault occurred was not inherent in the assault, but instead "was a separate course of conduct designed to remove her from the view of a passerby who might have hindered the commission of the crime"); *cf. State v. Irwin*, 304 N.C. 93, 103, 282 S.E.2d 439, 446 (1981) (holding victim's "removal to the back of the store was an inherent and integral part of the attempted armed robbery" because the defendant commanded the victim to open the safe in the back room).

¶ 49     Essentially, at this time, Defendant had ceased assaulting Ms. Gaster, could have let her leave the apartment, and had an opportunity to not begin assaulting her once more. *State v. Fulcher*, 294 N.C. 503, 524, 243 S.E.2d 338, 352 (1978) (holding evidence that victims were bound and prevented from leaving before suffering sexual assault was evidence of confinement distinct from the assault, because "the crime of kidnapping was complete, irrespective of whether the then contemplated [felony] ever occurred"). Ms. Gaster was specifically prevented from leaving her apartment and denied the opportunity to reach safety, subjecting her to further abuse. The trial court did not err in denying Defendant's motion to dismiss the charge of first-degree kidnapping.

### III. Conclusion

We hold the trial court did not commit plain error by not instructing the jury *ex mero motu* on the lesser-included offense of attempted voluntary manslaughter because the evidence did not support such an instruction. The trial court also did not err by not conducting an inquiry into Defendant's consent to defense counsel's statements in opening and closing arguments. The content of defense counsel's arguments did not constitute *Harbison* error as implied concessions of guilt. Finally, the trial court did not commit error by denying Defendant's motion to dismiss the charge of first-degree kidnapping because there was sufficient evidence of confinement to support the charge distinct from evidence of assault.

NO ERROR.

Judges TYSON and ARROWOOD concur.